CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 1 7 2012

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

OPHELIA AZRIEL DE'LONTA,  )  Civil Action No. 7:11-cv-00175
    Plaintiff,  )
        )
v.  )  **MEMORANDUM OPINION**
        )
GENE JOHNSON, et al.,  )  By:   **Hon. James C. Turk**
    Defendants.  )          **Senior United States District Judge**

Ophelia Azriel De'lonta, a Virginia inmate proceeding pro se, filed a civil rights complaint pursuant to 42 U.S.C. § 1983 and § 2000cc-1 with jurisdiction vested in 28 U.S.C. § 1331 and § 1343. Plaintiff names as defendants in both their individual and official capacities Gene M. Johnson, former Director of the Virginia Department of Corrections ("VDOC"); Linda Montalbano, a member of the VDOC Central Classification Services ("CCS"); G. K. Washington, a VDOC Regional Ombudsman; L. Edmonds, Warden at the Buckingham Correctional Center ("BUCC"), and B. W. Booker, the former BUCC Assistant Warden. Defendants filed a motion for summary judgment, and plaintiff responded, making this matter ripe for disposition. After reviewing the record, the court grants defendants' motion for summary judgment.

I.

Plaintiff alleges that she is a devout, practicing member of the Assemblies of Yahweh affiliation of Judaism, which requires her to eat a Kosher diet. Plaintiff became an adherent of the Assembles of Yahweh in 2006 while housed at the Powhatan Correctional Center ("PCC"). On April 10, 2008, the VDOC approved plaintiff's application for the Common Fare diet ("Common Fare") at PCC.[1] Plaintiff asked to stop receiving Common Fare on September 28,

---

[1] Common Fare is designed to accommodate offenders whose religious dietary needs cannot be met by the Master Menu. All foods purchased for Common Fare, except fruits and vegetables, are certified as Kosher. A correctional

2008, and the PCC ICA recommended that plaintiff's request be granted. The VDOC CCS approved the PCC ICA's recommendation on November 13, 2008, and plaintiff was not eligible to receive Common Fare for one year.

The VDOC transferred plaintiff from PCC to BUCC on April 6, 2010, because BUCC met plaintiff's security and classification requirements. Plaintiff stopped eating the foods prepared at BUCC on April 7, 2010, because those foods were not Kosher.[2] Plaintiff wanted to resume eating VDOC-prepared Kosher food at BUCC, and a counselor completed a Common Fare Diet Information Form on April 28, 2010. Plaintiff explained that she did not receive Common Fare at PCC because of her voluntary withdrawal.

The BUCC ICA met on May 3, 2010, reviewed plaintiff's application for Common Fare, and recommended "no action" because BUCC does not offer Common Fare. Booker reviewed the BCC ICA's "no action" recommendation, declined to recommend a disposition because BUCC is not a facility that provides Common Fare, and sent the BUCC ICA's report to the CCS.

Plaintiff filed a grievance on May 3, 2010, complaining that her religious dietary laws required her to eat Kosher and not Common Fare. Edmonds denied the grievance on May 23, 2010, while plaintiff's Common Fare application was pending with the CCS. Edmonds noted that the Kosher diet is no longer approved for newly arriving BUCC inmates. On June 4, 2010, Washington's assistant signed the Level II response upholding Edmonds' response because no violation of VDOC policy occurred.

---

facility Institutional Classification Authority ("ICA") and the VDOC's Central Classification Services ("CCS") reviews each inmate's application for Common Fare before an inmate may receive the special diet. An inmate may voluntarily withdraw from Common Fare, which is documented by the ICA and CCS, but the inmate cannot request Common Fare for one year in order to prevent institutional disruption.

[2] Plaintiff purchased and ate pre-packaged cheese crackers, brown rice, and fish from the BUCC commissary until she received BUCC-prepared Kosher meals.

Montalbano, on behalf of the CCS, authorized plaintiff's receipt of a Kosher diet on June 17, 2010. Montalbano did not approve Common Fare because that diet is not offered at BUCC, but several BUCC inmates receive a Kosher diet as a result of grandfathered policies and procedures.[3] Thus, Montalbano included plaintiff as one of the grandfathered inmates due to plaintiff's unique circumstances and the appropriateness of housing plaintiff at BUCC. Plaintiff has continued to receive a Kosher diet since June 30, 2010.

Plaintiff submitted an order for a religious head scarf on November 23, 2010, but Major Davis denied the request, stating scarves are not authorized in the VDOC. Edmonds denied plaintiff's regular grievance on December 27, 2010, explaining that head scarves are not an approved property item for offenders at BUCC because it is a male institution although religious scarves may be ordered at the Fluvanna Correctional Center for Women.[4] Plaintiff appealed Edmonds Level I response to a Regional Ombudsman for Level II review. The Regional Ombudsman's office received the Level I appeal on January 11, 2011, after the five-day period to appeal expired. The Regional Ombudsman rejected the Level I appeal as untimely filed and returned the unprocessed grievance to plaintiff.

On January 13, 2011, Booker received plaintiff's request to have a candle lighting ceremony, which allegedly was a "very religious" personal need. Plaintiff did not explain that the request was on behalf of anyone else. Booker denied the request because fire or flames, even if part of a religious ceremony, are not allowed; religious services are considered group activities; plaintiff's request was just for her; and accommodations are not separately scheduled

---

[3] The VDOC replaced its Kosher Diet menu with Common Fare. BUCC is one the VDOC facilities that does not regularly offer Common Fare.

[4] Plaintiff experiences a gender identity disorder that causes a feeling of being a female trapped in a male body.

3

for each inmate's personal request.[5] Prison staff or an experienced volunteer must be present in the room to watch inmates' religious services and group activities, which often strains staff resources and space availability for regularly scheduled group activities. Open flames and fire are prohibited within BUCC, especially within individual inmate living area, for security and safety reasons. Edmonds denied plaintiff's regular grievance, noting that Jewish services occur on Thursdays and that no extra time, space, or employees exist to extend the time for Jewish worship for the candle ceremony. Washington's assistant signed the Level II response affirming Edmonds' decision.

Plaintiff argues in her first claim that the denials of Kosher meals, a head scarf, and the candle ceremony violated the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Plaintiff argues in her second claim that defendants' denial of the Kosher diet and head scarf violated due process guaranteed by the Fourteenth Amendment. Plaintiff argues in her third claim that not immediately giving her a Kosher diet at BUCC interfered with her gender identity disorder treatment and allegedly caused adverse effects of self-surgery; stomach cramps; nausea; and weight loss of 27 pounds. Plaintiff argues in her final claim that Johnson failed to train, supervise, and promulgate policies requiring subordinates to comply with RLUIPA and the Religious Freedom Restoration Act ("RFRA").[6] Plaintiff requests unspecified compensatory damages, $100,000 in punitive damages, and injunctive relief to require defendants to give plaintiff a Kosher meal for as long as she remains in the care of the VDOC.

---

[5] Plaintiff participated in group Jewish services on Thursdays.
[6] The RFRA is unconstitutional as applied to state institutions. City of Boerne v. Flores, 521 U.S. 507 (1997). To the extent plaintiff brings a claim under the RFRA, defendants are entitled to summary judgment as a matter of law.

4

II.

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific, admissible facts that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248.

Even if there is no dispute as to the evidentiary facts, summary judgment is not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991). A court may not resolve disputed facts, weigh the evidence, or make determinations of credibility. Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995); Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). A court accepts as true the evidence of the non-moving party and resolves all internal conflicts and

5

inferences in the non-moving party's favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Furthermore, a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995). A plaintiff cannot use a response to a motion for summary judgment to correct deficiencies in a complaint challenged by a defendant's motion for summary judgment. See Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009) (noting that a plaintiff may not amend a complaint through argument in a brief opposing summary judgment); Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) (same).

III.

Defendants argue that plaintiff did not exhaust administrative remedies for her claims about the religious head scarf. Plaintiff responds that any failure to exhaust "was due to no fault of her own. . . . [Plaintiff] was on strip–cell mental health status from 12-23-10 until 1-10-11 which during that time she had no access to any mail. . . . See Delonta v. Pearson (4th Cir. 2011)." (Pl.'s Resp. (no. 31) ¶ 11.)

A prisoner must exhaust all available administrative remedies before filing a claim pursuant to 42 U.S.C. § 1983. 42 U.S.C. § 1997e(a). See Woodford v. Ngo, 548 U.S. 81, 85 (2006) (stating that "[e]xhaustion is no longer left to the discretion of the district court, but is mandatory"); Porter v. Nussle, 534 U.S. 516, 532 (2002) (stating that § 1997e(a) applies to "all

6

inmate suits, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong"); Booth v. Churner, 532 U.S. 731, 739 (2001) (finding that § 1997e(a) requires administrative exhaustion prior to the filing of a federal civil rights suit even if the form of relief the inmate seeks is not available through exhaustion of administrative remedies). Prisoners must not just initiate timely grievances but must also timely appeal any denial of relief through all levels of available administrative review. Woodford, 548 U.S. at 93 (holding that § 1997e(a) requires "proper exhaustion" of institutional administrative remedies before filing any federal suit challenging prison conditions).

VDOC Department Operating Procedure ("DOP") 866.1, Inmate Grievance Procedure, is a mechanism for inmates to resolve complaints, appeal administrative decisions, and challenge policies and procedures. The process provides correctional administrators means to identify potential problems and, if necessary, correct those problems in a timely manner. All issues are grievable except issues about policies, procedures, and decisions of the Virginia Parole Board; disciplinary hearing penalties and/or procedural errors; state and federal court decisions, laws, and regulations; and other matters beyond the VDOC's control.

Inmates are oriented to the inmate grievance procedure when they enter the VDOC and when they are transferred to different facilities. Prior to submitting a grievance, the inmate must make a good faith effort to informally resolve the complaint by submitting an informal complaint form, which is available in housing units. If not informally resolved, the inmate must file a regular grievance within thirty calendar days from the date of the occurrence or incident. Only one issue per grievance may be addressed. Regular grievances may receive three levels of review. A facility's Warden or Superintendent conducts the first, "Level I" review of the grievance. If the inmate is unsatisfied with the determination, the inmate may appeal the

7

determination within five calendar days to "Level II," which is usually done by the Regional Ombudsman/Director. Level II was the final level of review for plaintiff's issues.[7]

Plaintiff filed a regular grievance on December 3, 2010, complaining that her order for a religious head scarf was denied. Edmonds denied the regular grievance on December 27, 2010, explaining that while religious scarves may be ordered at the Fluvanna Correctional Center for Women, head scarves are not an approved property item for offenders at BUCC because it is a male institution. Plaintiff dated her appeal of Edmonds' response as December 27, 2010. The Regional Ombudsman's office received the appeal on January 11, 2011, after the five calendar-day period to appeal expired. The Regional Ombudsman rejected the appeal as untimely and returned the unprocessed grievance to plaintiff.

Plaintiff wrote the Regional Ombudsman to protest the decision and to ask for reconsideration, citing her strip-cell status until January 6, 2011; her inability to possess personal property until January 11, 2011; and BUCC's failure to process mail between December 29, 2010, and January 2, 2011. The Regional Ombudsman, responding by letter dated January 31, 2011, explained that the BUCC mailroom was open on December 29 and 30, 2010, but was closed between December 31, 2010, and January 2, 2011, for the holiday weekend. The Ombudsman upheld the decision that plaintiff untimely filed the appeal even after accounting for the time the BUCC mailroom was closed. Thus, plaintiff's attachments and defendants' evidence support defendants' conclusion that plaintiff did not comply with DOP 866.1 for appealing the Level I review within five calendar days, even after accounting for the days the BUCC mailroom was not operating.

---

[7] The VDOC Director or Deputy Director conducts the final administrative review for the few issues appealable to Level III.

8

"[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008). "[W]hen prison officials prevent inmates from using the administrative process . . ., the process that exists on paper becomes unavailable in reality." Kaba v. Stepp, 458 F.3d 678, 684 (7th Cir. 2006). Plaintiff reiterates in her response that she could not timely appeal because she "was on strip-cell mental health status" between December 23, 2010, and January 10, 2011, and allegedly without access to mail.[8] Plaintiff's receipt and signature of the Level I appeal on December 27, 2010, during which she allegedly did not have access to mail, controverts her alleged inability to access mail. Although plaintiff signed her appeal on December 27, 2010, she does not allege that she handed her appeal to a BUCC official for mailing or how any BUCC official refused to process her appeal during her "strip-cell mental health status." Consequently, plaintiff fails to establish how VDOC agents or "strip-cell mental health status," which plaintiff does not define or describe, prevented her from timely appealing.

Plaintiff's reliance on De'Lonta v. Pearson, No. 1:09-cv-1167, 2011 U.S. Dist. LEXIS 18986, 2011 WL 795934 (E.D. Va. Feb. 24, 2011), is misplaced. In De'Lonta v. Pearson, a district court determined for purposes of summary judgment that plaintiff was prevented from exhausting DOP 866.1's administrative remedies because a PCC investigator told her not to file grievances while an investigation at PCC was active.[9] Plaintiff fails to establish in this case how she could not timely file the appeal at BUCC, and a district court's excusal for plaintiff's failure to exhaust a claim in De'Lonta v. Pearson does not categorically excuse plaintiff from DOP 866.1's requirements in this case. Accordingly, defendants establish that plaintiff failed to

---

[8] Plaintiff says in her response that she was on strip cell status until January 10, 2011, although she told the Regional Ombudsman that she was on "strip cell until 6th of January."
[9] The claims raised in that action do not relate to the claims sub judice.

9

exhaust administrative remedies about her head scarf claim, plaintiff fails to establish that the grievance procedure was unavailable, and the defendants are entitled to summary judgment for the claims about the head scarf.

IV.

A. PLAINTIFF CANNOT RECOVER DAMAGES AGAINST DEFENDANTS FOR THE ALLEGED RLUIPA VIOLATION.

Plaintiff seeks damages against defendants in both their official and individual capacities. RLUIPA does not authorize claims for money damages against defendants in their official capacities. Sossamon v. Texas, ___ U.S. ___, 131 S. Ct. 1651, 1663 (2011) (abrogating Smith v. Allen, 502 F.3d 1255 (11th Cir. 2007)); Madison v. Virginia, 474 F.3d 118, 133 (4th Cir. 2006). RLUIPA also does not authorize claims for money damages against defendants in their individual capacities. Rendelman v. Rouse, 569 F.3d 182, 189 (4th Cir. 2009).[10] Accordingly, plaintiff may not recover damages for the RLUIPA claim.

B. PLAINTIFF MAY NOT RECOVER DAMAGES FOR CLAIMS AGAINST DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES.

Defendants argue that the claims asserted against them in their individual capacities are barred by the doctrine of qualified immunity. Qualified immunity permits "government officials performing discretionary functions . . . [to be] shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity provides immunity from suit rather than a mere defense to liability. Thus,

---

[10] Rendelman addresses claims for damages against a state or state officials under the Spending Clause axis of RLUIPA. Plaintiff fails to allege any facts in her complaint suggesting that her claims against defendants could qualify as actionable under the Commerce Clause section of RLUIPA, and the court declines to construct the claim for plaintiff.

whether a defendant can claim qualified immunity is a pure question of law and is properly determined pretrial. Saucier v. Katz, 533 U.S. 194, 200-01 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009) (permitting lower courts the discretion to determine which qualified immunity prong to analyze first).

Once a defendant raises the qualified immunity defense, a plaintiff bears the burden to show that a defendant's conduct violated the plaintiff's right, and the defendant must prove that the right violated was not clearly established at the time of the incident to receive qualified immunity. Henry v. Purnell, 501 F.3d 374, 378 (4th Cir. 2007). "The unlawfulness of the action must be apparent when assessed from the perspective of an objectively reasonable official charged with knowledge of established law." Lopez v. Robinson, 914 F.2d 486, 489 (4th Cir. 1990). See Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.").

Plaintiff argues in her first claim that the denial of Kosher meals, a head scarf, and the candle ceremony violated the First Amendment and RLUIPA. Plaintiff argues in her second claim that defendants' initial denial of the Kosher diet and head scarf violated due process. Plaintiff argues in her third claim that not receiving the Kosher diet for eighty four days interfered with her gender identity disorder treatment and allegedly caused adverse effects of self-surgery; stomach cramps; nausea; and weight loss of 27 pounds. Plaintiff argues in her final claim that Johnson failed to train, supervise, and promulgate policies requiring subordinates to comply with RLUIPA. For the following reasons, the defendants are entitled to qualified immunity for these claims.

11

1. Defendants are entitled to qualified immunity for plaintiff's RLUIPA and First Amendment claims about the denial of Kosher meals, a head scarf, and the candle ceremony.

Defendants establish rationales reasonably related to legitimate penological interests and least-restrictive, compelling governmental interests to delay plaintiff's access to the Kosher diet for eighty-four days while processing her application; preventing plaintiff from tying up prison resources with an individual religious ceremony in space used for group activities; and preventing fire in inmate living areas. Plaintiff fails to establish that a defendant violated a religious right by denying plaintiff's order for a female head scarf. Accordingly, defendants are entitled to qualified immunity for plaintiff's RLUIPA and First Amendment claims.

   a.      RLUIPA Standard

RLUIPA, in relevant part, provides that no government shall impose a substantial burden on the religious exercise of an inmate unless the government demonstrates that the burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc-1(a). "Government" includes defendants, who work for the VDOC. See id. § 2000cc-5(4)(A). A "substantial burden" on religious exercise occurs if it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, or . . . forces a person to choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand." Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (internal citations omitted).

To determine whether a plaintiff establishes a prima facie RLUIPA claim, a court must decide whether a plaintiff sincerely held the avowed belief and whether the belief is, in a plaintiff's own scheme of things, religious. United States v. Seeger, 380 U.S. 163, 185 (1965).

12

"Religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7). Defendants concede for purposes of summary judgment that plaintiff may have a sincerely held religious belief that she should eat a Kosher diet, wear a religious head scarf, and conduct the candle ceremony.

### b. First Amendment Standard

The Free Exercise Clause of the First Amendment extends to prison inmates. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987); Morrison v. Garraghty, 239 F.3d 648, 656 (4th Cir. 2001). However, an inmate's constitutional rights must be evaluated within the context of incarceration. The Supreme Court has long cautioned that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." Procunier v. Martinez, 416 U.S. 396, 405 (1974) (dictum). Thus, the court "must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration." Lovelace, 472 F.3d at 199.

This deference is achieved by a rational-basis test. The court considers four factors to determine if a prison regulation is reasonably related to a legitimate penological interest:

> (1) [W]hether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

Id. at 200 (quoting Turner v. Safley, 482 U.S. 78, 89, 92 (1987)). When applying these factors, the court must "respect the determinations of prison officials." United States v. Stotts, 925 F.2d

13

83, 86 (4th Cir. 1991). The plaintiff bears the ultimate burden of establishing that a prison regulation or decision is unconstitutional. Hause v. Vaught, 993 F.2d 1079, 1082 (4th Cir. 1993).

        c.      Analysis

                i.      Edmonds' and Washington's Grievance Responses

Plaintiff names Edmonds and Washington as defendants based on their Level I and Level II grievance responses, respectively, about the alleged denial of religious accommodation. An administrator's after-the-fact denial of a grievance is not a sufficient basis to establish that administrator's involvement in the actual deprivation of a constitutional or statutory right. See Boger v. Johnson, No. 7:10-cv-00194, 2010 U.S. Dist. LEXIS 132679, at *26, 2010 WL 5174364, at*8 (W.D. Va. Dec. 15, 2010) (citing Brooks v. Beard, 167 F. App'x 923, 925 (3rd Cir. 2006)) (finding that allegations that prison officials and administrators responded inappropriately to inmate's later-filed grievances do not establish the involvement of those officials and administrators in the alleged underlying deprivation), aff'd, 438 F. App'x 167 (4th Cir. 2011). Plaintiff does not otherwise describe any other relevant facts involving Edmonds or Washington and, thus, fails to establish how Edmonds or Washington substantially burdened a religious exercise or violated the First Amendment.

                ii.      The Kosher Diet

Plaintiff fails to establish that Montalbano substantially burdened plaintiff's religious exercise of eating Kosher foods. Montalbano approved plaintiff's receipt of a Kosher diet at BUCC because Common Fare is not available there. Plaintiff complains that Montalbano knew plaintiff religiously needed to eat Kosher food at PCC. However, plaintiff voluntarily withdrew from the Kosher-compatible Common Fare diet while at PCC. Plaintiff's withdrawal from

eating VDOC-prepared Kosher food reasonably demonstrated that plaintiff no longer wanted to eat VDOC-prepared Kosher food, and her voluntary withdrawal required her to reapply for a religious dietary accommodation.

Plaintiff also fails to establish that Booker substantially burdened her religious exercise of eating Kosher foods. Booker did not have the authority to grant plaintiff's request for a Kosher diet because the VDOC's CCS is vested with the authority to approve an inmate's application for Common Fare. Montalbano, as a member of the CCS, was the VDOC official with the authority to approve plaintiff's application, not the BUCC Assistant Warden. Booker neither approved nor disapproved plaintiff's application but merely forwarded the application to the CCS. Accordingly, plaintiff cannot establish that Booker substantially burdened plaintiff's religious exercise of eating a Kosher diet.

Plaintiff's complaint centers on the approximately nine calendar-days Booker considered the ICA's recommendation and thirty-five calendar days the CCS considered Booker's and the ICA's recommendation for plaintiff's Common Fare application. No delay in processing the application for Kosher food at BUCC would have occurred if plaintiff had not voluntarily withdrawn from Common Fare at PCC. It was plaintiff's voluntary withdrawal from Common Fare at PCC, not governmental action, that necessitated another application to receive VDOC prepared Kosher foods.[11] During this time, plaintiff purchased and ate Kosher foods from the BUCC commissary. Thus, plaintiff caused the need to reapply for Kosher foods, plaintiff could eat Kosher foods provided by the BUCC commissary, and the time for Booker and Montalbano to process and approve plaintiff's request was an incidental burden on plaintiff's ability to eat

---

[11] Although VDOC policy prohibits reapplication for one year, plaintiff did not reapply for nearly 18 months after withdrawing from Common Fare.

Kosher foods. See Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 450 (1988) ("[I]ncidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs" are insufficient bases to state a claim under Free Exercise Clause). To the extent there was a minor delay in processing plaintiff's application, officials' accidental or negligent actions that may impinge to some degree on plaintiff's religious practice are insufficient to support an actionable constitutional claim. See, e.g., Daniels v. Williams, 474 U.S. 327, 328 (1986); Davidson v. Cannon, 474 U.S. 344, 347-48 (1986); Whitley v. Albers, 475 U.S. 312, 320 (1986); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

iii.    The Head Scarf

Plaintiff alleges in the complaint, "Buckingham Corr. Ctr. substantially burdened plaintiff['s] exercise of religion, by denying her religious head attire (sc[ar]f)," and, "By Buckingham Corr. Ctr. administration, defendants name [sic] herein denying plaintiff her . . . religious sc[ar]f. . . ." (Compl. 11-12.) Plaintiff cannot proceed against Edmonds and Booker by generally alleging that the "Buckingham Corr. Ctr." and the "Buckingham Corr. Ctr. administration" violated her religious rights about the head scarf.[12] Although plaintiff specifically identifies Major Davis as denying the order for a head scarf, Major Davis is not a defendant. Plaintiff does not specifically identify any defendant's act or omission about plaintiff's order for a religious head scarf. Furthermore, plaintiff does not define or describe what she means by a religious "head scarf" or why it is religiously necessary for her. Moreover, plaintiff does not explain how not ordering a particular head scarf from a vendor substantially pressured her to modify behavior, especially since a "scarf" to cover the head ostensibly can be

---

[12] Johnson, Montalbano, and Washington are not part of the BUCC administration.

16

made of any cloth. Accordingly, plaintiff fails to establish that a defendant violated a religious right involving the head scarf.

iv.    The Candle Ceremony

Booker establishes a compelling governmental interest for denying plaintiff's January 2011 request for the candle ceremony. Booker denied plaintiff's request to have the candle ceremony because fire is a security risk and plaintiff's request was as an individual and not on behalf of a group. Plaintiff responded in her opposition to summary judgment with the argument that plaintiff "was voted by [BUCC] Judaism Group as the secretary whom duties are to submit request 'kite' to participate in [J]ewish holy day festivals[, like] lighting of the candle. . . ." (Pl.'s Opp. Summ. J. (no. 31) 2.) Plaintiff relies on inmates' affidavits, which acknowledge that plaintiff is the Secretary of the BUCC Jewish group. Notably, neither plaintiff nor the inmates aver that plaintiff was the Secretary of the BUCC Jewish group when plaintiff filed the candle ceremony request or that the BUCC Jewish group existed at that time. Plaintiff fails to submit any evidence to support the argument that she filed the request on behalf of any other inmate. Indeed, her request to Booker explicitly states that the candle service "is a very religious requirement that I must practice for my faith." (Booker Aff., Encl. A (emphasis added).)

BKCC officials have a compelling governmental interest in ensuring the safety and security of inmates and the orderly operations of the facility. Religious services and group activities require in-room VDOC staff supervision or experienced volunteer supervision to watch the event, which often strains staff resources and space availability for regularly scheduled group actvities. Permitting a single inmate to occupy group facilities to practice an allegedly personal religious observance would unduly interfere with prison administration by misallocating security personnel. Furthermore, open flames and fire are prohibited within the institution, especially

within individual inmate living areas where plaintiff would have conducted the candle ceremony if no group facility was available. The need to prevent inmates' access to fire within living areas is an obviously justifiable reason to maintain institutional security and discipline and prevent threats to inmates' safety. See, e.g., Davis v. Or. County, 607 F.3d 543 (8th Cir. 2010) (discussing consequences of a fire in a correctional facility).

> 2. Defendants are entitled to qualified immunity for plaintiff's claims that defendants' denial of the Kosher diet, head scarf, and candle ceremony violated due process or equal protection.

Plaintiff's second claim is that defendants violated due process guaranteed by the Fourteenth Amendment by denying her a Kosher diet and religious head scarf order. To establish a Fourteenth Amendment due process violation, plaintiff must prove that a defendant deprived her of a legitimate liberty or property interest. See Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570 (1972). Plaintiff's allegations of being denied a Kosher diet, a religious head scarf, and a candle ceremony do not state any claim of deprivation of a liberty or property interest, and the due process claim must fail.

Plaintiff instead appears to describe a Fourteenth Amendment right to equal protection under law. See Haines v. Kerner, 404 U.S. 519, 520-21 (1972) (discussing liberal construction of pro se complaints). The court construes the equal protection claim as challenging the BUCC's policy to require new BUCC inmates to seek approval for Common Fare although a few BUCC inmates already receive a Kosher diet.[13]

"'Prisoners are protected under the Equal Protection Clause . . . from invidious discrimination." Wolff v. McDonnell, 418 U.S. 539, 556 (1974). To establish an equal

---

[13] Plaintiff also identifies the deprivations of the head scarf and candle ceremony as due process violations, but as plaintiff acknowledges, the challenged policy does not relate to head scarves or candle ceremonies for newly arriving inmates at BUCC.

protection claim, plaintiff must show that she "has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). Thus, plaintiff must allege sufficient facts to establish that a defendant intentionally discriminated against her on the basis of religion by failing to provide her a reasonable opportunity to pursue her faith compared to other similarly situated religious groups. Cruz v. Beto, 405 U.S. 319, 321-22 (1972). Plaintiff must set forth "specific, non-conclusory factual allegations that establish improper motive." Williams v. Hansen, 326 F.3d 569, 584 (4th Cir. 2003).

Plaintiff fails to establish that any defendant is responsible for a policy or custom of discriminating against plaintiff by not automatically giving her a Kosher diet. See Chapman v. City of Detroit, 808 F.2d 459, 465 (6th Cir. 1986) (conclusory allegations of discrimination not sufficient to establish liability); Jaffe v. Fed. Reserve Bank of Chicago, 586 F. Supp. 106, 109 (N.D. Ill. 1984) (holding a plaintiff "cannot merely invoke his [religion] in the course of the claim's narrative and automatically be entitled to pursue relief."). Even if she did, plaintiff cannot establish that requiring an inmate to demonstrate a sincerely-held religious need for special dietary arrangements is a result of intentional or purposeful discrimination. By default, all BUCC inmates are given standardized, nutritionally adequate meals and may apply for a special, religious diet. Allowing each inmate to have a custom-created menu on request would unduly disrupt inmate meal preparation, service, and costs. Notably, plaintiff acknowledges that the policy applies equally to all newly arriving inmates at BUCC and not just her, and thus, plaintiff presents nothing more than a conclusory allegation of discrimination.

19

3. Defendants are entitled to qualified immunity for plaintiff's Eighth Amendment claims that not immediately receiving a Kosher diet allegedly interfered with her gender identity disorder treatment and caused self-surgery; stomach cramps; nausea; and weight loss of 27 pounds.

Plaintiff alleges that the denial of the Kosher diet for eighty-four days while her application was processed interfered with her gender identity disorder treatment and caused adverse effects of self-surgery; stomach cramps; nausea; and weight loss of 27 pounds. A plaintiff must show that a defendant acted with deliberate indifference to a serious medical need to state a claim under the Eighth Amendment for the unconstitutional denial of medical assistance. Estelle, 429 U.S. at 104. Deliberate indifference requires a state actor to have been personally aware of facts indicating a substantial risk of serious harm, and the actor must have actually recognized the existence of such a risk. Farmer v. Brennan, 511 U.S. 825, 838 (1994). "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). See Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) ("[T]he evidence must show that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'"). "A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position." Miltier, 896 F.2d at 851-52.

Plaintiff fails to illustrate how any defendant was aware that she did not eat the non-Kosher foods prepared by BUCC staff or that her food purchases from the commissary interfered with her gender identity disorder treatment and caused self-surgery; stomach cramps; nausea; and weight loss of 27 pounds. Furthermore, plaintiff does not describe a sufficient deprivation of

20

a basic human need since she refused to eat the VDOC prepared foods, bought food from the BUCC commissary, and does not allege that she did not receive medical care.

4.     Johnson is entitled to qualified immunity for plaintiff's claim that Johnson failed to train, supervise, and promulgate policies requiring subordinates to comply with RLUIPA.

Plaintiff alleges that Johnson failed to train, supervise, and promulgate policies requiring subordinates to comply with RLUIPA. Supervisory liability under § 1983 may not be predicated on the theory of respondeat superior. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 663 n.7 (1978). Section 1983 requires a showing of personal fault on the part of a defendant either based on the defendant's personal conduct or another's conduct in execution of the defendant's policies or customs. Fisher v. Washington Metropolitan Area Transit Author., 690 F.2d 1133, 1142-43 (4th Cir. 1982), abrogated on other grounds by Cnty. of Riverside v. McLaughlin, 500 U.S. 44 (1991). To impose liability on a supervisor for a failure to train subordinates, a plaintiff must plead and prove that 1) a subordinate actually violated the plaintiff's constitutional rights; 2) the supervisor failed to properly train the subordinate, thus illustrating a supervisor's "deliberate indifference" to the rights of violated by the subordinate; and 3) the failure to train actually caused the subordinate to violate the plaintiff's rights. Brown v. Mitchell, 308 F. Supp. 2d. 682, 701 (E.D. Va. 2005) (citing City of Canton v. Harris, 489 U.S. 378, 388-92 (1989)).

Other than a general allegation that Johnson failed to train, supervise, and promulgate policies, plaintiff does not allege Johnson's specific act or omission that substantially burden her ability to practice her religion. Plaintiff also fails to describe how Johnson had any knowledge of the facts described in the complaint, and plaintiff fails to establish that a subordinate violated a civil right. Accordingly, supervisory liability against Johnson must fail.

C.  PLAINTIFF DOES NOT HAVE A VIABLE REMEDY AGAINST DEFENDANTS IN THEIR OFFICIAL CAPACITIES.

Plaintiff requests damages and injunctive relief against the defendants in their official capacities. The Eleventh Amendment bars suits in federal courts for money damages against an "unconsenting State." Edelman v. Jordan, 415 U.S. 651, 663 (1974). This immunity extends to "arms of the State," including state agencies and state officers acting in their official capacity. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977); Gray v. Laws, 51 F.3d 426, 430 (4th Cir. 1995). Virginia has not waived its sovereign immunity to § 1983 damages actions. Accordingly, plaintiff may not recover damages against defendants in their official capacities. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). Plaintiff is not entitled to equitable relief for the reasons discussed in this opinion.

V.

For the foregoing reasons, the court grants defendants' motion for summary judgment.

The Clerk is directed to send copies of this Memorandum Opinion and the accompanying Order to plaintiff and counsel of record for defendants.

**ENTER**: This 17th day of July, 2012.

Senior United States District Judge

22